Carney R. Shegerian, Esq. (SBN. 150461)
CShegerian@Shegerianlaw.com
**SHEGERIAN & ASSOCIATES, INC.**
225 Santa Monica Boulevard, Suite 700
Santa Monica, California 90401
Telephone Number: 310.860.0770
Facsimile Number: 310.860.0771

Chad B. Wootton, Esq. (SBN. 151188)
chadwootton@woottonlawgroup.com
Amy T. Wootton, Esq.  (SBN 188856)
amywootton@woottonlawgroup.com
**WOOTTON LAW GROUP, LLP**
119 ½ N. Larchmont Blvd., Suite 2
Los Angeles, California 90004
Telephone Number: 323.460.2100
Facsimile Number: 323.460.2112
*Attorneys for Plaintiff MEGAN NEWMAN*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MEGAN NEWMAN, an individual,<br><br>Plaintiff,<br><br>v.<br><br>JAMES N. MATTIS, SECRETARY, U.S. DEPARTMENT OF DEFENSE, in his official capacity on behalf of the DEFENSE CONTRACT MANAGEMENT AGENCY; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No.:  2:18-cv-8185<br><br>**COMPLAINT FOR:**<br><br>1. **SEX-BASED DISCRIMINATION (DISPARATE TREATMENT) IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. §§2000e, *et seq*., as amended ("Title VII");**<br>2. **SEX-BASED HARASSMENT (HOSTILE WORK ENVIRONMENT) IN VIOLATION OF TITLE VII; and**<br>3. **RETALIATION IN VIOLATION OF TITLE VII**<br><br>**JURY TRIAL DEMANDED** |

## SUMMARY OF THE CASE

1.      In this action, the plaintiff, Megan Newman ("Newman" or "Plaintiff"), alleges that Defendant James N. Mattis, Secretary, Department of Defense, acting in his official capacity for Newman's employer, the Defense Contract Management Agency ("DCMA," "the Agency" or "Defendant"), along with her former supervisor Anthony Gayden ("Gayden"), harassed her, created a hostile work environment, and discriminated against her because of her gender. Newman complained about Gayden's harassment and discrimination, by reporting it through the appropriate channels, including to (1) Gayden's direct supervisor, (2) other management personnel, (3) the Union, (4) the Agency EEO office (February 2016-December 2016), and (5) later filing a complaint with the EEOC (which led to EEOC proceedings from December 2016 – June 2018, before Newman recently requested the EEOC to issue a Right to Sue Notice). However, despite all of these efforts, Defendant failed to take any meaningful actions to bring a halt to the harassment and discrimination. Rather, each step of the way, Defendant intensified its harassment and discrimination against Newman and severely *retaliated* against her in various reprehensible ways.

2.      First, Gayden created a hostile working environment by making inappropriate comments and exuding inappropriate behavior. Gayden angrily stated that he wanted to "shake the shit out of [his] wife." He also commented that

he wanted punch another female employee in the face.  Then, Gayden left a disturbing message for Newman on her personal cell phone saying *"When you get this message, I need you to call me, this is Jimmy Walker, the late night stalker."* Newman was concerned, fearful, and uncomfortable.  She then reported Gayden.

3.     Second, after Newman complained about the harassment and discrimination by Gayden – a large man with a military background who weighs approximately 250 pounds and is approximately 5'10", who routinely tries to physically intimidate Newman, who is just 4 feet and 10 inches tall and weighs less than half of what Gayden does -- Defendant forced Newman to continue working in close proximity to Gayden and failed to discipline him in any way.  Gayden takes full advantage of this situation by attempting to intimidate Newman on a daily basis, by stomping back and forth in front of her office, leering in at her, pounding on her office walls, leaning against the window of her office, sitting on her window sill, slowly running his fingers and hands across her window, and engaging in other creepy, threatening and intimidating behaviors.  Gayden also harasses other female employees who speak up against his unlawful conduct and retaliates against anyone who talks to Newman, causing a chilling effect and isolating Newman.  Gayden also loudly, verbally mocks the EEO process initiated by Newman, so that Newman and other employees are sure to hear him.  On one occasion, Gayden blocked Newman from getting her lunch from the refrigerator,

then when she was finally able to get her food, interrupted lunch by using a bullhorn to call a fire drill, stating there was a fire in the kitchen when no such fire existed.

4.     Additionally, after Newman complained about the harassment and discrimination, Defendant retaliated against her in a number of other ways, including by making Newman work in close proximity to *DCMA's legal representative* in the EEOC proceedings, ostracizing her, undeservedly lowering the scores on her performance reviews, making up false charges against her, suspending her from work without pay based on false and weak charges that did not merit a suspension, following her around the office, starting to track her time and attendance using security cameras, and taking steps to take away her security clearance (which if successful would have cost Newman her job with DCMA).  In taking such actions, DCMA actively participated in the harassment, discrimination and retaliation and ratified all of Gayden's misconduct.

5.     The ongoing harassment, discrimination and retaliation has caused Newman severe emotional distress and accompanying physical symptoms, damaged Newman's prospects for career advancement within the DCMA, negatively impacted her reputation, adversely impacted her marriage, and caused her to suffer significant economic and non-economic damages.  Newman experiences extreme emotional distress on a daily basis as a result of a work

environment in which she is routinely intimidated, belittled, criticized, disciplined and made to feel powerless and worthless.  Newman has suffered, *inter alia*, severe stress, anxiety, increased blood pressure, stomach ulcers, episodes of vomiting, sleeplessness and panic attacks. Through this action, Newman seeks to bring an end to Defendant's unlawful employment practices, which have impacted (and continue to impact) not only her but other female employees at DCMA, and obtain appropriate relief.

6.     Accordingly, Newman brings this employment harassment, discrimination and retaliation case pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e, *et seq.*, as amended ("Title VII").

## JURISDICTION AND VENUE

7.     This Court has original jurisdiction of Plaintiff's Title VII claims pursuant to 28 U.S.C. §§1331 and 1343(a)(4).

8.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2) and 42 U.S.C. §2000-5(f)(3). The DCMA is subject to personal jurisdiction in this District in that it maintains facilities and business operations in this District, employs Plaintiff in this District, and all or most of the acts events giving rise to this action occurred in this District.

//
//

## **THE PARTIES**

9.     At all times relevant to this matter, Plaintiff Newman, a female, has resided in this jurisdictional district.  Newman began her employment with the DCMA on September 20, 2015, first in the position of Management Analyst Human Resource Specialist (GS-0343-11), then, effective October 16, 2017, in the position of full time Union Steward with AFGE Council 170.  Newman was consistently rated as an outstanding employee and also received two cash awards and one time-off award for her successful performance. Prior to the DCMA, Newman worked for NASA and has over twenty years of total federal service. Newman is a victim of gender-based harassment, hostile work environment, discrimination and retaliation at the hands of Gayden, Mission Support Operations Chief (NH-0343-03), formerly Newman's direct Supervisor (from September 2015-October 2017), and the DCMA.

10.     Defendant James N. Mattis, is the Secretary for the Department of Defense and is named as a defendant in his official capacity on behalf of the DCMA.

11.     The true names and capacities, whether individual, corporate, associate, or otherwise, of defendants sued herein as DOES 1 to 10, inclusive, are currently unknown to Plaintiff, who therefore sues Defendants by such fictitious names.  Plaintiff is informed and believes, and based thereon alleges, that each of

the defendants designated herein as a DOE is legally responsible in some manner for the unlawful acts referred to herein.  Plaintiff will seek leave of court to amend this Complaint to reflect the true names and capacities of the defendants designated hereinafter as DOES when such identities become known.

12.     At all times mentioned herein, each of said Defendants participated in the doing of the acts alleged to have been done by the named Defendants; and furthermore, the Defendants, and each of them, were the agents, servants, and employees of each and every one of the other Defendants, as well as the agents of all Defendants, and at all times mentioned herein, were acting within the course and scope of said agency and employment.  At all times mentioned herein, Defendants, and each of them, were members of, and engaged in, a joint venture, partnership and common enterprise, and acting within the course and scope of, and in pursuance of said joint venture, partnership and common enterprise.

13.     At all times herein mentioned, the acts and omissions of various Defendants, and each of them, occurred with and contributed to the various acts and omissions of each and every one of the other Defendants in proximately causing the complaints, injuries and damages alleged herein.  At all times mentioned herein, Defendants, and each of them, approved of, condoned and/or otherwise ratified each and every one of the acts or omissions complained of herein.  At all times herein mentioned, Defendants, and each of them, aided and

abetted the acts and omissions of each and every one of the other Defendants, thereby proximately causing the damages as alleged.

### STATEMENT OF FACTS

14.    As noted above, Newman, who has over twenty years of total federal service, has been employed with the DCMA since September 20, 2015.  Newman was consistently rated as an outstanding employee. During her less than three years at DCMA, Newman also received two cash awards and one time-off award for her successful performance.  Newman first held the position of Management Analyst Human Resource Specialist (GS-0343-11), then, effective October 16, 2017, held the position of full time Union Steward with AFGE Council 170.  Newman has been employed by the United States government for over 20 years.

15.    Beginning on Newman's first day of work, Gayden, her Direct Supervisor at the time, asked Newman to join him for lunch alone.  She obliged. Thereafter, Gayden continued to ask her to go to lunch with him several more times.  Newman felt pressured to oblige and went to lunch with Gayden on multiple additional occasions.  During the private lunches, Gayden praised and complimented Newman and made disparaging remarks about the other female employees.  He made inappropriate comments to Newman such as, "Keep listening to me and doing what I tell you to do," "I'll protect you," and "I'm going to take care of you."  Gayden was attempting to take his work relationship with Newman

to a personal and intimate level, in which Newman had no interest.  Gayden was also making efforts to turn Newman against other female co-workers.  Gayden's actions, behavior and comments made Newman very uncomfortable.

16.     On Newman's second day at work, September 21, 2015, Gayden pulled Newman into his office and told her that he expected her to "be part of the solution and not part of the problem," unlike female employees Deanna Fluharty ("Fluharty") and Patty Salopek ("Salopek"), who he described as "troublemakers." He told Newman to stay away from Fluharty and Salopek and referred to Newman as the best employee he had.

17.     Beginning on the second day of Newman's employment and continuing several times a week thereafter, Gayden would regularly stand much too close to Newman, routinely hover over her or over her shoulder while she was seated in front of her computer, or crouch down low next to her while looking at Newman or her computer screen.  Newman could feel Gayden's close presence and the heat of his breath.  She felt uncomfortable and protested by saying "personal space" or "you're in my personal space."  Gayden did not care that Newman did not like it, would ignore her requests for personal space, and gave her dirty looks when she protested.  Each time Gayden did this, Newman felt anxious and stressed.

18.     On or about November 16, 2015, when introducing a new male employee, Derrick Gordon ("Gordon") to the MSO team members, Gayden complained that female employee Salopek gave him a hard time and exclaimed that he would like to "punch her [i.e., Ms. Salopek] in the face."  Newman was appalled and began getting worried and afraid about whether Gayden might be capable of violence towards female employees who got on his bad side.

19.     Around the same time, Gayden said, in a serious, aggressive and violent tone, that he wanted to "shake the shit out of [his] wife."  Again, Gayden's violent words and tone shocked Newman.  Gayden's words, demeanor and tone, combined with his actions and hostile statements about females, caused Newman to fear that he might actually act violently towards her, other female workers, and his wife.  Gayden's multiple threats of aggression toward females was both offensive and scary.  Newman, as any reasonable person would, considered the threats of violence towards her female co-workers and Gayden's wife to be offensive, serious, and egregious.

20.     On November 20, 2015, on the heels of Gayden's violent comments about other women, Gayden left a message for Newman on her personal cell phone during an alert roster check (the roster of information is supposed to be used for emergency purposes *only*) that she received in the evening at home saying *"When you get this message, I need you to call me, this is Jimmy Walker, the late night*

*stalker."* The creepy message shocked Newman.  This comment, coupled with Gayden's comments to her at lunch that she was his "favorite," repeated requests that Newman accompany him to lunch, repeated invasions of Newman's personal space, and hostile statements threatening violence towards women (meant to show his power over women) appeared to be a continuance of the sexual predatory behavior Gayden was exhibiting.  Gayden's message to Newman was also left during the week of her wedding, and both she and her then-fiancé were very upset by the message.  It was an unwelcome, inappropriate, threatening, and unprofessional act by Newman's direct supervisor.  Newman feared that Gayden was continuing his sexual advances, was stalking her or would stalk her, or worse.

21.    Gayden made other inappropriate and offensive comments about females in the workplace that he did not make about male employees.  For example, in addition to his comments about wanting to "shake the shit" out of his wife and wanting to punch Salopek in her face, Gayden called her a "heifer," and another female employee, Fluharty, a "nagging" employee, a "Chihuahua," and a "barking dog."  Further, there was a high level of hypocrisy about who was allowed to use profanity in the office.  While Gayden, a male, frequently tossed around profanities such as "old ass," "smart ass," "shit," and "WTF," female employees were punished for using such language.  For example, when female employee Salopek used foul language, Gayden wrote her up.

COMPLAINT                                    10

22.     In November 2015, Newman requested permission to telework one day per week. Gayden verbally denied her request without any basis.

23.     In December 2015, Newman got the courage to report the inappropriate "stalker message" Gayden left for her to Gayden's supervisor, Deputy Commander, Brian Bennett ("Bennett").  Bennett did not ask her to replay the message and seemed to think it was of no importance.

24.     On or about December 23, 2015, in the presence of Fluharty and Gayden's two uncles, Gayden belittled Newman, accused her of lying and falsifying her timecard.  Although the accusations were completely false, Newman advised Gayden that it was inappropriate for others to be present for this type of discussion and requested that such a conversation be in private.  Gayden obliged, but not before he succeeded in bullying Newman and causing her to feel humiliation, stress and anxiety.

25.     In December 2015, Newman again contacted Gayden's supervisor, Bennett, to report the hostile working conditions.  Bennett failed to take any action, and turned the matter back over to Gayden.

26.     On January 26, 2016, Gayden instructed Newman to travel to San Diego and Poway overnight on a work trip (referred to as a "TDY") with the new male co-worker, Gordon.  The trip would require Newman and Gordon to drive together to and from their destinations, stay overnight in the same hotel in a

suburban area, commute to and from the work locations together, eat together, and remain together outside of working hours.  Newman told Gayden that she and her husband were not comfortable with her traveling alone with and being reliant on a new male co-worker (who was close with Gayden) during the overnight trip. Gayden completely dismissed her concerns, saying that he did not care about what Newman or her husband thought.  Newman explained that it was inappropriate to force her to go given her level of discomfort but Gayden insisted that she do what he said.  Gayden remained insistent that Newman travel with Gordon. However, Newman's discomfort, anxiety and safety concerns were too severe and she drove her own car for the work event.

27.   Newman contacted her Union to explain that she was uncomfortable being alone with a male co-worker with whom she did not feel safe, or know for an extended period of time, and to request reimbursement for the use of her own vehicle to San Diego. Thereafter, the Union contacted Gayden to explain that per the Joint Travel Regulation ("JTR"), Newman was permitted to use her own vehicle to for the San Diego TDY.

28.   Gayden was not happy being challenged and having his directives questioned.  So, shortly thereafter, on February 10, 2016, Gayden presented Newman with her Performance Appraisal of a "3," which is merely a "satisfactory" rating.  However, when Newman asked why she was not given a higher rating of

COMPLAINT                                    12

"5," which was warranted, Gayden said in a condescending and rude tone, "because I am the boss," letting Newman known that he could do *whatever* he wanted.  This rating resulted in Newman not receiving a monetary bonus.  Further, Gayden threatened to give Newman a low "1" rating on "teamwork."  Gayden's only example of Newman's purported "lack of teamwork" was her refusal to go to lunch with him.  This sexual pressure caused Newman to feel extremely stressed that her performance evaluations were based on whether she accompanied Gayden to lunch instead of her actual job performance, which was stellar.  Keeping her composure, Newman told Gayden she *was* a team player explaining that she coordinated office events, worked with the MSO Team, Army Servicing Team, new employees and supervisors to complete tasks.  Newman was extremely concerned about her ratings as they affect her income, her career growth and monetary performance awards.  Similarly, according to Salopek, Gayden had lied about Salopek's job performance and falsely wrote her up for missing deadlines she did not miss.  No male employees were subject to such behavior on the part of Gayden.  Further, Newman was the only member of Gayden's team that did not receive a monetary award or a "5" on the performance appraisal.

29.    Gayden's campaign of harassment and retaliation continued.  Six days later (at the end of the day on February 16, 2016), when Newman was leaving to pick up her 1-year-old baby from daycare, Gayden instructed Newman to wait to

have a meeting with him, stating in an aggressive tone, "stay, do not leave" until he came out of a meeting. (This directive was heard by Analyn Suarez ("Suarez"), the Commander's secretary as well.)  Newman waited for an hour until Gayden was ready, at which time she told him she needed to leave to get her baby from daycare.  Gayden's callous response was, "you can leave when I tell you you can" and to make other arrangements for her baby.  Gayden waited until his supervisor, Bennett, left work, and then held the meeting in Bennett's office.  During the meeting, Gayden stood in front of the office door, blocking any exit, yelled at Newman and was very aggressive in his demeanor.

30.     Gayden also had Gordon in the office with him, who is 6'4" large male estimated to weigh approximately 285 pounds, who was merely there for intimidation purposes. Each man alone is intimating, but together, coupled with their actions and volume, were absolutely nerve wracking to Newman, who as noted above is only 4'10".  Gayden told Newman that she had to do whatever he told her to do.  He angrily stated, "I don't care about the JTR or what the Union said."  He also told Newman that he would not pay for her to take her own vehicle to San Diego (and officially denied her request for $150 in reimbursement for her mileage on or about March 30, 2016).  Gayden was aggressively asserting his power and authority in retaliation for Newman's contact with Bennett and the Union regarding her rights.

COMPLAINT                                14

31.     Newman had arranged to use her "fitness time" on that date; instead, Gayden denied her fitness time and kept her in the office for 1 ½ hours *past* her regular work shift (or "tour of duty"), seemingly to show her that rules did not apply to him and that she would be punished for challenging him. Newman was forced to make arrangements for someone else pick up her baby because Gayden compelled her to attend this non-essential meeting.  The following day, Newman requested overtime compensation for the meeting she was forced to attend.  In response, Gayden denied her request for overtime and told her that if she tried to seek overtime for the meeting, he would remove her from maxi-flex and change her schedule to a fixed schedule.

32.     Gayden continued his relentless and unforgiving harassment of and discrimination against Newman.  Three days later, on February 19, 2016, Newman was supposed to attend a meeting with the Deputy, Bennett, and Gayden in Bennett's office regarding safety matters.  At the scheduled time, Newman went to the front door of the front office area, which was normally open and unlocked.  On this day, the secretary was out of the office; Bennett's office was behind a closed and locked front office area.  After Newman knocked on the door, Gayden walked over to the locked door, eyed her through the large glass window, and asked where her badge was.  Newman told Gayden that her badge was at her desk and requested that he let her in for the meeting.  Instead of opening the door to allow Newman

entry, Gayden instructed Newman to get her badge and then return to the office. Newman rushed back to retrieve her badge from her desk and told Suarez, Stephanie Rodder (Townsend) and Fluharty that Gayden refused to allow her into Bennett's office without her badge.  This is true even though (1) there was no requirement that she have her badge with her at all times, and (2) Gayden had never required her (or any other employees) to have her badge previously.  When Newman returned to Bennett's office with her badge, Gayden smugly told her that the meeting had been cancelled the day before.  It was clear that Gayden was enjoying harassing Newman.  Newman expressed as much to Fluharty, who echoed the sentiment as she too, as a female, experienced Gayden's mistreatment and disrespectful means of communication (including, but not limited to Gayden referring to Fluharty as a "little barking dog," a "nagging employee," and a "Chihuahua").

33.     Later that day, Gayden sent Newman an email accusing *her* of being rude and unprofessional by revealing to her co-workers that he would not open the door.  Newman was in disbelief.

34.     Thereafter, Gayden went to Newman's desk and "apologized" in a condescending manner for not telling her earlier that the meeting had been canceled.  Newman told Gayden that he should apologize for not opening the door for her.  Gayden, using his authoritarian tone, told Newman that he did not have to

open the door for her, and continuing to flex his power, accused her of being rude and confrontational.  It was clear that Gayden did not like that Newman refused to succumb to his advances and challenged his inappropriate behavior.

35.     On or about February 22, 2016, after reporting Gayden's behavior to Bennett and the Union, Newman contacted an Equal Employment Opportunity ("EEO") official and reported Gayden's harassment, discrimination and retaliation. She was hopeful that her concerns would be promptly and properly handled and that the harassment would cease.

36.     Gayden was aware that Newman had reported him because she had to request "official time" to contact the Union and the EEO office.  Additionally, Gayden admitted in his June 22, 2016 statement, that he was first made aware of Newman's complaints in February 2016, when Newman sent the Deputy Commander an email about her complaints.

37.     Gayden's intimidating and hostile behavior continued. On or about March 14, 2016, Gayden stormed into the cubicle where Newman and Salopek were talking and laughing about how Salopek eats chili cheese fries when she gets stressed out.  Gayden angrily demanded to know why Newman was laughing and acted in a threatening and intimidating manner, physically closing in on Newman in the small cubicle area.

COMPLAINT                                    17

38.     Gayden continued to display aggression, intimidation, hostility and rudeness toward Newman and the other female employees, whereas he did not act in the same manner toward male staff (comprised of Sam Huleis, Gordon and Marvin Dados), continuing his gender harassment and discrimination.

39.     Gayden then provided Newman with false deadlines, wrongly accused Newman of failing to meet deadlines, criticized Newman's work, disregarded her suggestions, and provided her with urgent, unrealistic and artificial deadlines.  For example, on March 15, 2016, he asked her to create a Fire Prevention Plan and to turn it in to him *the same day*, which she did. After not receiving any feedback from Gayden on the plan for a month, Newman inquired as to the status.  Gayden dismissively told her, "I still have it."  On another occasion, Gayden made an urgent request that Newman prepare an appointment memo for an on-boarding employee.  After Newman completed it, Gayden flippantly told her he no longer needed the memo.

40.     On April 5, 2016, Gayden falsely accused Newman of failing to timely provide a Management Internal Control Assessment ("MICA") briefing, when in fact she timely turned it in to Deputy Bennett, Commander Colonel Joel Hagen, Salopek and Gayden.  Newman sent Gayden an email explaining that she complied with the deadline, but Gayden never responded.

41.     Also, on April 5, 2016, Gayden pulled Newman into his office, pointing a finger in her face and instructing her not to speak and to just sit and listen.  Gayden then scolded Newman for telling Salopek that he had given Newman dirty looks and refused to give her overtime to complete her work.  Then, Gayden yelled, "Now, get out of my office!"  Newman felt intimidated, scared and further harassed.  She felt it more so because Salopek and Fluharty told her that Gayden had been aggressive and hostile with them and Newman had witnessed Gayden's aggressive and condescending treatment of female employees, including herself, in the past.  Other females have complained of harassment by Gayden including Salopek, Cathy Davis ("Davis"), Alphosia Black ("Black"), Kimberly Melo ("Melo"), Suarez, and Fluharty, but no action was taken by management, thereby ratifying the conduct.

42.     Instead of guarding the safety and security of Newman and other female employees and ensuring the end of the harassment, Bennett and others in management have defended Gayden's actions at every turn, continuing its legacy of allowing unlawful harassment, discrimination and retaliation in the workplace.  Newman is aware of Gayden's harassment and mistreatment of other female employees, including, but not limited to Fluharty, Davis, Black, Suarez, Melo, and Salopek.  Newman is also aware that these women reported Gayden's inappropriate conduct to Bennett and others in management to no avail.  Some of

COMPLAINT                          19

these female employees decided to leave DCMA, Palmdale to escape Gayden's harassment, which was permitted to continue by management.  Fed up with this approach, Newman filed a formal Charge of Discrimination with the DCMA EEO office on April 9, 2016.

43.     Instead of the harassment ending, it intensified, and the retaliation was swift.  On April 11, 2016, Gayden instructed Newman to advise him when she intended to use her *approved* maxi-flex time, which permitted her to leave 30 minutes early when she arrived 30 minutes early (from her scheduled tour of duty of 7:30 a.m. – 4:00 p.m.).  This is true despite the fact that Gayden did not ask this of any other employee, and despite the fact that his requirement was a violation of the CBA, which permitted employees to adjust their schedule after completing 80 hours of work in a 2-week time period.  It is clear that Gayden was exerting his authority in an attempt to silence Newman.

44.     The following day, on April 12, 2016, when Newman was leaving for lunch at 12:10 p.m., Gayden told Newman that she needed his approval if she was not going to take her lunch at her regularly scheduled time (12:00p.m)  This is true despite the fact that Gayden did not ask this of any other employee and employees were allowed to go to lunch within the window of time of 11:00 am – 1:00 p.m. Newman did not appreciate being treated differently because she reported his misconduct, but she complied with his directive, and ended up not taking lunch

breaks on most days.  Gayden's conduct was clearly punishment for Newman's opposition to his behavior.

45.     As further punishment for engaging in Union activities, reporting Gayden to the EEO, and in an attempt to push her out, Gayden assigned Newman numerous duties and responsibilities outside of her position description, giving her a virtually-unmanageable workload, despite the fact that some of her co-workers (Huleis and Gordon) did not have enough work. Gayden piled extra duties and tasks on Newman as punishment for her opposition, engaging in Union activities, reporting him to the EEO, and in an attempt to push her out of the Agency. Gayden's conduct caused Newman to experience extreme stress and anxiety, requiring her to take prescription sleeping pills and anxiety medication.  Newman also needed to work through her lunches in order to manage her growing workload.

46.     With the stress and anxiety continuing to grow, Newman submitted a second request to telework.  Predictably, Gayden (unreasonably) denied the request falsely claiming that Newman had performance and conduct issues which prevented her from teleworking.  When Newman asked for an explanation for the issues, Gayden simply ignored her.

47.     On May 6, 2016, Gayden met with Newman to discuss her quarterly performance.  During the meeting, Gayden told Newman that she had the potential to be an "outstanding performer" if she could just "let things go."  This suggestion,

that she simply ignore his inappropriate behavior and withdraw the EEO case, was completely unprofessional and inappropriate.

48.     During the meeting, Gayden also told Newman that the Deputy Commander of the Tertiary, DCMA, Dr. John Barman had complained that she was rude and disrespectful.  Concerned, Newman approached Barman and told him that if it was true, she wanted to apologize.  However, it was *not true*.  Dr. Barman emailed Newman, Gayden and the Tertiary Commander, and said Newman had never been rude or had an attitude in any of her discussions with him, and that he appreciated her professionalism.

49.     During the same meeting, Gayden also told Newman that the mission had not been completed when she went to San Diego and Poway because the employee who drove with Gordon to San Diego, Black, arrived late and did not complete the inspection.  Gayden stated that *Newman* was to blame by failing to monitor the other employees.  However, it was not Newman's responsibility to monitor Black.  Further, when Black was questioned about the incident, she stated that the assignment given by Gayden was impossible to complete and that the trip was doomed from the outset.

50.     At or about this same time, Newman learned that female employees Salopek, Black, Suarez, Melo and Fluharty also received unjustified negative feedback from Gayden.  Newman is informed and believes that this was a result of

(1) their gender, and (2) their substantiation of Newman's complaints against Gayden.

51.     Gayden continued displaying threatening and hostile behavior during a MSO meeting on May 10, 2016.  During the meeting, Gayden told the team that they needed to have each other's backs and that he did not want to get caught with his "britches down."  The team was confused so Newman politely raised her hand to explain what Gayden was referencing.  Gayden immediately yelled at Newman to go to his office.  In his office, Gayden told Newman that he did not ask for her input and if he wanted her input he would ask for it.  They returned to the meeting and Newman went to sit down.  Gayden directed Newman to close the door and to lose her attitude.  Newman closed the door and told Gayden that he could lose his attitude too.  Gayden, seething with anger, told Newman to follow him.  She was fearful that he was going to physically assault her.  Gayden took her to the deputy's office and made her sit outside of the office while he spoke to the deputy.  The deputy did not intervene or speak to Newman.  Instead, Gayden told Newman not to return to the meeting and to go back to her desk.  It was very embarrassing and humiliating for Newman.

52.     The following day, May 11, 2016, during a DCMA meeting, when everyone was seated, Gayden continued the hostile working environment when he told Newman, "Get up and move against the other side of the wall where I can see

you." This caused her further embarrassment and humiliation.

53.    In a statement submitted by Black, she attested that a couple of days after this meeting, Bennett met with the MSO team individually regarding the situation. Black told Bennett that *Gayden treated the female employees differently from the male employees and that Gayden was particularly unfair towards Newman, to the point that she was worried for Newman*. Black requested a mediation and Bennett promised one, but it never materialized.

54.    Shortly thereafter, on May 31, 2016, Gayden stripped Newman of her duty of running the MSO slides (the briefing for the weekly meeting), which was a task reserved for a senior employee and a task she enjoyed, and told her to return to her desk. Gayden then gave the task to male employee Huleis, even though it should have gone to Salopek, who was the lead.

55.    Gayden's retaliation continued. Between May 24, 2016 and June 1, 2016, Gayden refused to rewrite Newman's Individual Performance Plan ("IPP") with obtainable goals, in his retaliatory quest to set up Newman for failure. For example, Gayden wrote that Newman had to complete the on-boarding forms within an unreasonable time period that did not account for everything that Newman and others had to do to finalize the forms. Newman complained about this unobtainable goal in emails to Gayden and Bennett, but never received any response.

56.     Gayden continued his retaliatory campaign.  On June 3, 2016, he told the MSO team to submit their time cards early (they were due on Monday, but he was asking for them to be turned in on Friday instead) if possible.  When Newman was leaving the office on Friday, Gayden stopped her and accused her of failing to follow instructions because she had not turned in her timecard.  Newman explained that she was unsure of her schedule the following week and could not turn her timecard in that day, but would turn in her time card on Monday with all of the necessary information, when it was due. Gayden responded, "If you don't turn it in, then I will consider it a failure to follow directions."  His hostility and aggression was apparent in each of his words.  He reiterated his statement in an email.  He made no such demands of the male employees or the employees who did not file EEO complaints against him.  Newman then went to Bennett and explained the situation and the fact that half of the team would not be completing their timecards until Monday and how she was being singled out by Gayden. Newman received permission to turn in her time card on Monday, but not before Gayden had improperly threatened her.

57.     On June 30, 2016, a Report of Investigation ("ROI") was prepared by Laird S. Abbott ("Abbott"), Lt. Col. USAF, Investigating Officer regarding Newman's complaints against Gayden based on discrimination and hostile work environment.  The investigation included, *inter alia*, a statement by Don Edwards

("Edwards"), Director of Aircraft Operations at DCMA Palmdale, who stated that Newman was the ***fourth female employee to complain*** to him about Gayden's unfair treatment of females and creation of a hostile work environment.  Edwards said because all four females (Cathy Davis, Cheryl Anderson, Deanna Fluharty and Newman) had very similar complaints about Gayden and no one else had complained to him about any other supervisor in this manner, he took their complaints seriously and reported them to Bennett.  Bennett told him to "provide a safe haven" for the female employees, but not to take any actions as he was in the "midst of counseling" Gayden.  Lt. Col. Schmidt also provided a statement regarding his observations of Gayden belittling, aggressively yelling at and standing too close to female employees, his advice that they do not need to endure such abusive working conditions, and the fact that Gayden did not treat him, a male employees, in the same manner. Statements were obtained by others, including Gayden, Newman, Fluharty, and Suarez.  Newman stated that her complaints had not been properly remedied and that it caused her and other female employees to not feel safe at work.  Suarez stated that Gayden speaks differently to male employee Gordon, and when Gayden is mad, "he can't control his emotions." She described working with Gayden as "being in an abusive relationship."  Abbott concluded that Gayden's approach to supervising is militaristic, and that he is often loud and abrasive, which is tolerable/acceptable to the male employees, "while the

majority of his female employees find it offensive."  He noted that the preponderance of the witness statements obtained "point to a less than desirable work environment" for Gayden's MSO team.  Despite these findings, no meaningful actions were taken by DCMA to remedy the situation.

58.     On or about July 12, 2016, Newman went into Bennett's office and reported that Gayden was engaging in witness intimidation as to those involved in her EEO complaint. Immediately after she reported it to Bennett, Gayden went into Bennett's office. When Gayden left Bennett's office, he was visibly irritated and angry and immediately assigned Newman additional work.

59.     Thereafter, Newman documented her complaints about witness intimidation in an email to the Agency's Ethics Attorney Anthony Carr, the Western Region commander, Col. Trevino, the EEO, Bennett, Gayden and the Union.  Newman revealed that some of the witnesses who were identified in connection with her EEO complaint, told her that Gayden had approached them in an intimidating manner, trying to get them to support him in the EEO case. Specifically, Gayden told Salopek, "If you have my back, I will have yours." Huleis and Black also told Newman that Gayden had made similar comments to them and to Suarez.  Regrettably, no action was taken.

60.     Salopek submitted a request in April 2016, for an On-The-Spot monetary award (up to $500) for Newman, the-then HR Management Analyst,

based upon a new employee onboarding program she successfully developed and implemented.  Although it was announced at the MSO staff meeting on July 27, 2016 (during which Newman was not in attendance as she was giving a statement in the EEO case) that the onboarding process was a benchmarked process that was going to be implemented as a best practice and utilized throughout DCMA Contract Management Offices ("CMO"), in retaliation, Gayden ensured that Newman's award was not approved by the executive board by failing to endorse her.  Instead, he credited the program to the "team," further cementing that Newman's accomplishment would not be recognized or rewarded.

61.     During August and September 2016, Gayden still refused to modify Newman's IPP.

62.     In response to Newman's EEO complaint, between July 2016 and November 2016, the Department of Defense – Defense Civilian Personnel Advisory Service Investigations and Resolutions Directorate – investigator(s) conducted interviews.  On December 15, 2016 the investigation was complete and a ROI was issued.

63.     The Agency then asked Newman if she wanted it to issue a Final Agency Decision (FAD) or if she wanted the United States Equal Employment Opportunity Commission ("EEOC") to issue a decision and/or hold a hearing. Newman requested that the matter be handled independently by the EEOC.

Newman then filed a request for a hearing with the EEOC in December 2016, alleging she was discriminated against, subjected to harassment, forced to work in a hostile work environment and received disparate treatment on the basis of her sex and in retaliation for her protesting the unlawful conduct.

64.    Thereafter, Newman was on leave for a few weeks.

65.    On or about January 20, 2017, Gayden disclosed *Newman's* performance appraisal to Huleis.  Newman questioned Gayden and Huleis as to why her performance appraisal had been revealed.  No explanation was provided.

66.    A few weeks later, on February 13, 2017, Gayden again revealed *Newman's* performance appraisal when he included it in Black's termination package.  So, on or about February 21, 2017, Newman filed a complaint with OSC over Gayden's release of her performance appraisal to Black and Huleis, which constituted a Privacy Act violation.  Although there was a finding that there was a Privacy Act violation, and supervisors are held to a higher standard (Table of Penalties), no action was taken against Gayden.

67.    On April 5, 2017, Gayden denied Newman's second request to telework.

68.    On May 1, 2017, Newman retained counsel through the AFGE / Union – Designation of Women's and Fair Practices ("WFP") and her attorney sent a designation of representation to the EEOC and Agency.  Despite the

numerous complaints about the hostile working conditions Newman had to endure, and her retention of counsel, no tangible action was taken.  Bennett repeatedly defended Gayden's actions and allowed the harassment, discrimination and retaliation to continue and the hostile working conditions to flourish.

69.     On May 12, 2017, Gayden gave all of the employees one hour off, except for Newman.

70.     On May 30, 2017, Newman contacted the Fraud Waste Abuse hotline and anonymously reported that Gayden and Gordon would "call" meetings and go into a room and do jumping jacks, squats, push-ups and jog around the office, calling out "shredded beef" and "bang-n-bods"  She also complained that they hung up posters in the office, which pointed directly at her cubicle, with Gordon's face superimposed with a finger pointing outward, with words that read, "how much of a banged-up body do you want."  The posters were inappropriate, did not belong in what was supposed to be a professional environment, and made Newman uncomfortable.  She felt that the posters were a threat to her because they pointed directly at her and referred to a "banged-up" body (which can have more than one meaning, either "in shape" or "injured / beaten up").  She was unsure why management thought they were entertaining and appropriate in the workplace, and whether they were designed to threaten Newman and make her more uncomfortable.

71.     After Newman's report, the workouts ceased and the posters were removed.  However, the retaliation increased.

72.     Days later, on June 7, 2017, Gayden contacted the CMO Commander, Col Brian Bohenek, complaining that he was told that Newman had shared *his* annual appraisal award information with other members of the MSO team months earlier.  This type of information was commonly discussed in the office.  It appeared, therefore, as though Gayden's complaint about Newman was in direct retaliation for Newman's recent report to the Fraud Waste Abuse hotline and all of her prior complaints of harassment and discrimination.

73.     Lt. Col. Erich Grade investigated the matter, and concluded from his investigation that "it is still common practice for many employees to discuss this type of information without the consent of all parties involved."  Newman was temporarily relieved.  She returned to focusing her attention to her work and her ever-growing EEOC case.

74.     Gayden resumed the harassment and retaliation. In June 2017, Newman's *name and breasts were drawn on a whiteboard in the office.*  Newman was appalled and complained to Gayden, who was walking behind her at the time, and the Commander.  Gayden hurriedly and inexcusably erased the evidence.  The Commander performed an "investigation" but refused to release the results or any of the information he obtained.  Gayden once again suffered no consequences.

75.     On June 30, 2017, the EEOC provided the acknowledgment and order for a hearing.  In retaliation, Gayden once again awarded one hour off of work to everyone except for Newman.

76.     On August 9, 2017, Newman and Salopek heard Gayden on the phone making fun of sexual assault, the Sexual Assault Prevention and Response ("SAPR") program (which is a sexual assault program designated to educate and to provide support and treatment for their families who have experienced any form of sexual assault), and the EEOC process.  Newman and Salopek notified the Commander, who ordered an investigation ("CDMI") in September 2017.  During the interview with the investigator, Gayden was caught outside of the door listening.  Upon the conclusion of the investigation, Gayden was ordered by the Commander to move two offices away from Newman; unfortunately, Gayden remained steps away from Newman.  This was hardly a solution.

77.     During the late summer/fall of 2017, as the EEOC case was proceeding, Gayden was attempting to intimidate witnesses in the EEOC case that had supported Newman.  Gayden yelled at Melo, Salopek and Suarez to "get off the fence and pick a side," and accused them of being "part of the problem," referring to Newman and her then-pending EEOC case. These comments were made because of the ongoing EEOC case that Newman initiated, and constitutes further evidence of both Gayden's retaliation and his abuse of his managerial

authority in an attempt to further isolate Newman, force witnesses (his female subordinates) to choose sides by intimidation, and improperly manipulate the result of the EEOC case.  Newman was very concerned about this witness tampering/intimidation, and reported these actions to DCMA management and the EEOC as well. Newman alleges that by promising/giving preferential treatment to witnesses, including bonuses, awards and allowing telework work, Gayden was able to convince at least one witness (Fluharty) to "pick his side."

78.   As further harassment, discrimination, intimidation and retaliation, *Joshua Cumming, the Agency's legal representative in the EEOC case, was assigned to work near Newman's cubical.*  He was situated there between August 2017 and his abrupt resignation in June 2018 (following Newman's filing seeking sanctions against him).  During work, Cumming would corner Newman in the breakroom and try to obtain information from her regarding her EEOC case. Newman's WFP attorney Erika Dorsey ("Dorsey") had to instruct Cumming that his actions were inappropriate, to stay away from Newman at work, and to contact Dorsey if he had questions about the EEOC case.

*79.*   Gayden continued to create a hostile work environment, misuse and abuse his supervisory position, and to violate Department of Defense policy, as well as DCMA policy.  Between July and November 2017, at the time depositions in the EEOC case were underway, *Gayden ordered Gordon to track Newman's*

*time and attendance (and that of the other female employees) with surveillance*

*cameras.*

80.     In mid-October 2017, Melo, Suarez and Salopek became aware of the time and attendance tracking and stalking of them around the office. The three of them notified Newman about a notebook that was openly displayed on Gordon's desk which detailed the tracking of all of them. The stalking behavior was also noted by two other females who occupied cubicles in the office space but were not assigned to the office, Marrian Tampon and Maggie Monroe ("Monroe"). The behavior was offensive and caused grave concern to these six females and together they reported it to the Agency Insider Threat Program.  Further, since Gayden had already referred to himself as being a "stalker" in the voice-mail message he left for Newman, these actions constituted additional stalking behavior, causing Newman severe stress, anxiety, increased blood pressure, stomach ulcers, episodes of vomiting, sleeplessness and panic attacks.

81.     Newman reported this (and Gayden's other egregious retaliatory conduct) to the Commander, Col. Bohenek, Brian Sullivan of the Agency's Insider Threat Program, Linda Galimore and Clinton Covert in the EEO office, Willie Williams at Agency Labor Employee Relations ("LER"), Wendy Weidenfeld, Agency's lead counsel, and Vice Admiral, Lewis, the head of DCMA, through multiple emails beginning on November 20, 2017,  Newman's complaints were

finally acknowledged by VADM Lewis on the Director's Blog, where he indicated that bullying and intimidation are forms of harassment and not tolerated in the workplace.  He further stated that DCMA CMO Commanders "managers and supervisors are duty-bound to lead by example by pro-actively taking steps to make our workplace a positive and safe environment for employees, free from discrimination, harassment, intimidation or other prohibited behaviors."  Col. Bohenek finally acknowledged Newman's emails on May 9, 2018.

82.     After enduring and protesting the unending harassment and retaliation, and being forced to sit outside of Gayden's office in a cubicle for two years, Newman applied for and was selected to serve as a full time Union Steward with AFGE Council 170 effective October 16, 2017, which moved her into a private office (although still near Gayden) and allowed for additional telework days.

83.     Although Newman had a new position and a new supervisor, Gayden continued his threatening behavior. He glared at Newman and gave her dirty looks as she sat in her new office. Then, Gayden began pounding walls, stomping outside of her office, and slowly sliding his fingers along the base of her window.  These acts were inappropriate and often startling, stress-producing, disturbing and intimidating.

84.     The Agency permitted the harassment, discrimination and retaliation to continue without bounds, seemingly in an attempt to cause Newman to reconsider pursuing her complaints with management, the Union, the EEOC, and beyond.  However, Newman continued to oppose the hostile working conditions. Unfortunately, her resistance was not without further retaliation. After a 20-year impeccable career with an outstanding record, on November 9, 2017, *Bennett issued Newman a proposed three-day suspension* based on the prior incident involving Gayden's award information, which had been investigated and concluded, and an additional charge.  The proposed suspension was an attempt to ruin Newman's reputation, retaliate against her for engaging in protected activity, and show others what would happen to them if they opposed management's practices. The first specification alleged that on or about January 23, 2017 (*almost a year earlier*) Newman "sent personally identifiable information (PII), specifically, appraisal performance award data, about [her] first line supervisor, Mr. Anthony Gayden, Supervisory Management Analyst, to other members of the Management Support Office (MSO) team, this conduct having no legitimate business purpose."  This charge was completely unjustified since the information is accessible to the public, is not confidential, and was based on an event that occurred almost 10 months earlier.  Further, when Gayden had shared Newman's job appraisal with other and Newman complained about it, no action was taken by

the DCMA against Gayden.

85.     The second charge alleged that Newman "on or about August 22, 2017, at the DCMA Palmdale CMO, conducted [herself] in a manner that was disruptive in a meeting held by your first line supervisor, Mr. Anthony Gayden, about another member of the Management Support Office (MSO) team, a 100% disabled veteran, when the veteran [Huleis] volunteered to hang a display case on the wall in the office, to include saying 'You are 100% disabled Vet, you can't do that. I'm going to call the VA fraud hotline and I'm going to record videos of you and send them in' or words to that effect, this conduct having no legitimate business purpose." This charge was similarly unwarranted. First, Newman did not make the statements attributed to her, as evidenced by the witness statement obtained. Second, no one had ever spoken to Newman at the time claiming that she did or said anything improper in that meeting. Third, the statement she did make was acknowledged by everyone as a joke, for which she received laughter. Fourth, she was never asked to provide a statement about what occurred. The Agency's charge was supported only by statements from *some* of the people present at the meeting, including Gayden, male employees Gordon and Huleis, and female employee Fluharty (who had succumbed to Gayden's pressure to "pick [his] side" as a result of the witness tampering discussed above). The retaliation was seemingly limitless and spiraling up the chain of command.

86.     On November 27, 2017, Newman disputed the proposed suspension and charges of misconduct with evidence, including the deciding official's review and consideration, and statements of witnesses, who were suspiciously not interviewed.  All of the witnesses, including Huleis, supported Newman's position that she did **not** say, "You are 100% disabled Vet, you can't do that."  Moreover, the witnesses, including Huleis, agreed that Newman's statement that she was going to call the VA fraud hotline and send videos to them was made in jest and elicited laughter from those present.

87.     Col. Bohenek advised Newman that on November 30, 2017, he issued a "cease and desist" order to Gayden directing him to stop conducting the security camera footage investigation of Newman.  The relief was minimal. The Western Region of the DCMA essentially condoned Gayden's behavior.  Gayden should have been punished for stalking Newman, yet the Agency claimed Gayden, as the management official, was exempt, and once again, Gayden suffered no consequences for his actions.

88.     The retaliation began its climb toward its pinnacle on December 19, 2017, when Newman was contacted by the Agency Security Office to complete a SF-86 Security Questionnaire in order to maintain her security clearance for her position. *This security clearance reinvestigation was very suspicious given the fact that her clearance was not up for renewal, as she had just been hired in September*

*2015 and clearances are reviewed every 5 years.* Within the questionnaire, Newman was asked whether she had been officially reprimanded, suspended, or disciplined for misconduct in the workplace within the last seven years.  Newman timely and truthfully completed the questionnaire on January 23, 2018.

89.     *After* the submission of her security clearance questionnaire, DCMA Palmdale Commander Brian Bohenek issued a decision letter on January 30, 2018, sustaining both specifications of the proposed charge and suspending Newman from her position for 3 days without pay. (The suspension was then served from February 3, 2018 through February 5, 2018. The wrongful and retaliatory suspension is the subject of an administrative arbitration for which Newman is seeking back pay; the arbitrator's decision is expected on September 21, 2018.) [1]

90.     The following day (January 31, 2018), Newman received an email from mission partner Monroe claiming that she felt intimidated by Gayden and his group, Gordon and Fluharty.  Monroe felt like she was being watched and monitored by Gordon and Fluharty to report to Gayden. Monroe added that the Agency seemed to ignore their wrongdoing and feared retaliation if she supported

---

[1]  Newman is **not** seeking back pay for the 3-day suspension in this action, as that was the subject of the arbitration, as required under the rules applicable to same. However, Newman did not seek to recover damages in connection with the severe *emotional distress* arising out of the suspension, or any related relief, which is sought in *this* action.

Newman, noting that *the backlash Newman received was "obviously driven by the EEO case filed."* Monroe noted that there "seems to be a steel umbrella over them [Gayden and Gordon]."

91.     On February 1, 2018, Newman was contacted by Maya Moore, Supv. Personnel Security Specialist, HQ Personnel Security, advising that someone had notified her office of *a suspension that Newman had not disclosed on her security clearance paperwork.* This accusation was not only highly suspicious, but it was false. Newman had **not** received any suspension at the time she completed her security clearance paperwork. Thus, the false accusation that she had lied on her security paperwork was extremely troubling. Additionally, **only** Gayden, Gordon, Bennett and Col. Bohenek had knowledge that Newman had been required to complete a SF-86, and **only** Gayden, Bennett and Col. Bohenek were aware of the ***then-pending proposed*** suspension at the time she filled out the paperwork. Therefore, one (or more) of these people had to have communicated the information to the Security Office about Newman in retaliation for her ongoing complaints and in the hopes that she would not obtain a security clearance. *Newman was completely shocked and fearful that her livelihood was in jeopardy, as her job required security clearance.*

92.     Due to the seriousness of the false allegation and attack on her security clearance, Newman retained legal counsel to assist her with a response at a

cost of $3,000.  Newman promptly submitted a response to Moore on February 7,

2018, explaining that she answered the question in the security clearance

paperwork truthfully, as she had not been formally disciplined or suspended at the

time she submitted the questionnaire and there was no question regarding *proposed*

disciplinary actions.

> The question in Section 13 asked if I had been "officially" reprimanded,
> suspended, or disciplined for misconduct in the workplace in the last seven
> years.  According to Title 5 USC 75 a suspension is defined as "the placing
> of an employee, for disciplinary reasons, in a temporary status without duties
> and pay".  Furthermore, the procedural guidelines for suspending an
> employee are delineated in 5 CFR 752.  The procedural guidelines were
> instituted so that the respondent is afforded due process.  5 CFR 752 states in
> pertinent part that, the Agency must specify in writing the reasons for the
> decision to the employee on or before the proposed suspension to make the
> action official.  Therefore, on January 23, 2018 I answered "no" because
> pursuant to law, I was not officially suspended.  I fully answered this
> question honestly and fully in my submission.  There is no area where one
> would address a proposed action.

93.    On February 7, 2018, AFGE Local 2433 President Timothy Maimone

("Maimone") filed a grievance on Newman's behalf challenging the January 30,

2018, suspension as lacking just cause and disputing the merits of the charges,

alleging that the suspension was based on retaliation for protected activity and that

the Agency violated policy by not conducting a proper investigation that included

taking a statement from Newman about what occurred. On February 28, 2018, the

Union was notified that its grievances were denied.

94.    After the Union's grievances were denied, it invoked arbitration.  The

arbitration was conducted and concluded on July 11, 2018.  A decision has not been rendered as of the filing of this complaint; as noted above, the arbitrator's decision is currently expected on September 21, 2018.

95.     Hence, for nearly three years, Newman has endured daily harassment and been subjected to a horrific hostile work environment with countless acts of retaliation.  As set forth herein, Gayden gives Newman dirty looks, glares at her, and exhibits aggressive behavior, including walking outside of Newman's office, banging on the wall, running his fingers/hands along her office window and sitting on her office windowsill.  He trumps up false accusations against Newman and does everything within his power to make her life miserable and drive her out of the DCMA.  Gayden not only has retaliated against Newman for making complaints, reporting his behavior to a governmental agency and participating in the EEO/EEOC process, but he has retaliated against those that support Newman, essentially causing a chilling effect, in an effort to discredit and isolate Newman. Gayden has engaged in additional behaviors including, verbally mocking the EEO/EEOC process, and on April 19, 2018, he physically blocked Newman from getting her lunch from the office refrigerator, and after she retrieved it, interrupted her lunch break by using a bullhorn to call a fire drill, claiming that there was a fire in the kitchen when there was none.  He also took steps to get her suspended and is believed to have participated in jeopardizing her security clearance, which if lost

could have cost Newman her job.

96.    Instead of attempting to end the many complaints, hold responsible those creating the issues or those who disregard the complaints, the Agency has attempted to destroy Newman's stellar reputation, a 20-year career in the federal government, and denied her the right to work in a safe and respectful environment.

97.    All of this conduct, coupled with management's blatant and repeated failure to take any action to end the harassment and retaliation, caused Newman to sustain severe physical and emotional ailments and harm, requiring medical treatment by Kaiser and Dr. M. Patel. Newman has suffered sleeplessness, anxiety, stress, depression, PTSD, marital strain, humiliation, emotional distress, loss of self-esteem, excessive fatigue, ulcers/gastrointestinal issues, weight gain, elevated blood pressure, hair loss, nausea/vomiting and headaches, requiring numerous doctor visits, therapy sessions, prescription medications, use of sick leave and the costs associated therewith. Newman was wrongfully denied mileage reimbursement, monetary awards and bonuses, and preservation of her stellar 20-year professional reputation.  Additionally, Newman lost benefits and potential advancements and raises as a result of the performance appraisal(s) issued by Gayden and the other acts of discrimination set forth herein, including a Quality Step Increase (QSI), which is a *permanent* salary increase. Such a salary increase permanently affects retirement and bonus awards.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

98.     After exhausting her administrative remedies, including complaints to Gayden and upper management, the Union, the EEO and the EEOC without meaningful change, Newman requested a right to sue from the EEOC Administrative Judge on June 20, 2018.  In response, the EEOC Administrative Judge issued an Order on June 26, 2018, which was served on Newman's counsel on July 10, 2018.  A copy of the Order granting Newman the right to sue (along with emails confirming that the Order was intended to serve as the right to sue notice) is attached to this complaint as Exhibit A.  This complaint is filed within 90 days of the June 26, 2018 Order.

## FIRST CLAIM FOR RELIEF

### SEX-BASED DISCRIMINATION (DISPARATE TREATMENT) IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. §§2000e, *et seq*., as amended ("Title VII")

99.     Plaintiff incorporates by reference and realleges each and every allegation contained in paragraphs 1 through 98 above as though fully set forth herein.

100.   Title VII of the Civil Rights Act of 1964, as amended, makes it unlawful for an employer, "(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).

101.   As set forth in detail herein, Defendant DCMA, by and through its managers, including Gayden and Bennett, discriminated against Newman by treating her differently from her male coworkers, because of her sex (female).

102.   In particular, Newman was subjected to the following acts of discrimination because of her sex, among the other incidents discussed above:

- Gayden made violent and inappropriate comments about females in Newman's presence, including, stating that he wanted to "shake the shit out of [his] wife" and that he wanted to "punch" a female employee in the face.

- Gayden repeatedly asked Newman to go to lunch with him and praised and complimented her when she was alone with him.

- Gayden initially made disparaging remarks about the other female employees while making domineering and sexist remarks to Newman, such as, "Keep listening to me and doing what I tell you to do," "I'll protect you," "stay away from the troublemakers" and "I'm going to take care of you."

- Gayden regularly stood too close to Newman, hovered over her or over her shoulder, and crouched down low next to her while looking at Newman or her computer screen, and ignored her requests for "personal space."

COMPLAINT                          45

- Gayden derogatorily referred to female employees as "heifer," "nagging," "Chihuahua," and "barking dog."

- Gayden left a disturbing message for Newman on her personal cell phone saying *"When you get this message, I need you to call me, this is Jimmy Walker, the late night stalker."*

- After Newman declined Gayden's lunch invitations, he became increasingly hostile and angry with her.

- In the presence of others, Gayden belittled Newman and falsely accused her of falsifying her timecard.

- Newman reported the hostile working conditions created by Gayden to Bennett in December 2015, but, Bennett failed to take any action, allowing the harassment to continue unfettered.

- Someone drew a picture of Newman's name and breasts on a whiteboard in the office.

- A poster was hung up in the office pointing directly at Newman which had a large, physically imposing male employee (the 6'4" Gordon) pointing a finger at Newman and stating "how much of a banged-up body do you want?" (One definition of "banged up" is "beaten up" or "injured;" "banging" also has sexual connotations.)

- After Newman expressed her concerns about an overnight TDY with a male employee, Gayden completely dismissed her concerns, saying that he did not care about what Newman or her husband thought.

- Gayden presented Newman with an unwarranted Performance Appraisal of a "3," which Gayden justified with "because I am the boss, and threatened to give Newman a low "1" rating on "teamwork," based on her refusal to go to lunch with him. Newman was the only member of the team that did not receive a monetary award or a "5" on the performance appraisal.

- After Newman reported Gayden's conduct to the Union, Gayden did not allow Newman to leave work on time to pick up her 1-year-old baby from daycare, angrily instructing her "you can leave when I tell you you can" and instructing her to wait at work for a meeting with him.

- During the above-meeting, Gayden and another large, physically imposing (6'4") DCMA employee, Gordon, trapped Newman (4'10") in an office and blocked the door.  In that meeting, Gayden angrily yelled at Newman and told her that he did not care about the JTR or the Union, and that he would not pay for her to take her own car to San Diego.  He kept her 1 ½ hours *past* her regular tour of duty, and thereafter, officially denied her request for $150 mileage reimbursement, denied her fitness time, and her request for overtime for attending the meeting which he forced her to attend.

- Gayden rudely denied Newman entry to a scheduled meeting insisting that she first get her badge, and when she returned, callously told her that the meeting had been canceled.

- Gayden refused to acknowledge Newman's birthday, despite the fact that he celebrated all of the other team members' birthdays.

- Gayden yelled at Newman and other female employees, and often ordered her and the female employees around in a loud and intimidating voice, and stood or crouched inappropriately close to the female employees to intimidate them, but did not act this way towards the male employees.

- Gayden gave Newman false and unrealistic deadlines, but not the male employees.

- Gayden added job tasks to her workload outside the scope of her position, which he did not do to male employees.

- Gayden removed enjoyable job duties from Newman and gave them to male employee(s).

COMPLAINT                                    47

- Gayden required Newman to seek permission to take *pre-approved* maxi-flex time, but did not require the same of male employees.

- Gayden required Newman to seek permission to take her lunch break if she did not commence it at precisely 12:00 p.m., while he did not do so with male employees.

- Gayden unreasonably denied Newman's requests to telework, but allowed the male employees to telework.

- Gayden told her during her quarterly performance review, that she had the potential to be an "outstanding performer" if she could just "let things go," obviously referring to her Union complaints and the EEO case.

- Gayden falsely told Newman that he received a complaint from the Deputy Commander of the Tertiary, DCMA that she was rude and disrespectful.

- Gayden wrongfully blamed Newman for the alleged shortcomings of another female employee, Black, for which Newman had no responsibility, and did not do the same to Gordon, who actually accompanied Black on the trip to San Diego.

- Gayden humiliated and undeservedly punished Newman in team meetings.

- Gayden intimidated and attempted to tamper with the female witnesses in Newman's EEO case.

- Gayden instructed Gordon to track Newman's time and attendance (as well as another female employee who supported and echoed Newman's complaints) with surveillance cameras between July and November 2017, until Gayden was ordered to cease.

- Bennett took no actions against Gayden despite Newman's repeated pleas and complaints.

- After Newman, through her own efforts, became a full-time Union steward, Gayden pounded her office walls, stomped outside her office, slid his fingers along the base of her window, and peeked into her office, which he did not do to male employees.

- Gayden falsely accused Newman of disseminating private information about Gayden.

- Gayden and the DCMA falsely attributed statements made by others to Newman.

- Gayden and the DCMA wrongfully issued Newman a 3-day suspension, which was the first such mark on her 20-year stellar record.

- the DCMA falsely accused her of lying on her security clearance paperwork, thereby jeopardizing her security clearance and consequently, her livelihood.

103.    Newman's sex was the determining factor and/or a motivating factor in Defendants' actions.

104.    As a direct, legal and proximate result of the discrimination, Newman has sustained, and will continue to sustain, compensatory damages to be proven at trial. Additionally, as a result of Defendant's actions as alleged herein, Newman has suffered severe emotional distress and resulting medical issues and medical expenses as a result of the unlawful conduct described herein.  Newman's stress level was so high that it caused significant health issues and bodily injury. Newman has suffered sleeplessness, anxiety, stress, depression, PTSD, marital strain, humiliation, emotional distress, loss of self-esteem, excessive fatigue,

ulcers/gastrointestinal issues, weight gain, elevated blood pressure, hair loss, nausea/vomiting and headaches, requiring numerous doctor visits, therapy sessions, prescription medications, use of sick leave and the costs associated therewith.  Additionally, Newman was wrongfully denied mileage reimbursement, monetary awards and bonuses, and preservation of her stellar 20-year professional reputation.  Newman is entitled to compensatory damages (pecuniary and non-pecuniary) in an amount to be proven at trial, but not less than $300,000.

105.   Additionally, Newman has employed and will continue to employ attorneys for the initiation and prosecution of her action. Newman has incurred and will continue to incur attorneys' fees and costs herein.  *In addition to* the $300,000 maximum award for compensatory damages, Newman is entitled to an award of attorneys' fees and costs in an amount to be proven at the time of trial.

106.   Newman is also entitled to lost benefits, back pay, potential advancements and raises, including the QSI, to which she would have received had Defendant not acted illegally.  These damages are not subject to any cap.

107.   Newman is also entitled to loss of front pay, the compensation and benefits judged necessary to make up for the lost pay and benefits that the employee would have earned in the future absent the discrimination.  These damages are not subject to any cap.

108.    Newman is also entitled to injunctive relief, including but not limited to, the removal of negative performance appraisals, removal of the unwarranted suspension and other disciplinary actions from Newman's personnel file, and an order to stop the disparate treatment set forth herein. Newman further seeks all other injunctive, declaratory, and monetary relief available for discrimination at trial.

## SECOND CLAIM FOR RELIEF
## SEX-BASED HARASSMENT (HOSTILE WORK ENVIRONMENT) IN VIOLATION OF TITLE VII

109.    Plaintiff incorporates by reference and realleges each and every allegation contained in paragraphs 1 through 108 above as though fully set forth herein.

110.    Newman was subjected to harassment, and a hostile work environment by Defendant DCMA's agents and employees, including Gayden and Bennet, because of her gender/sex, female, through the following acts, omissions and events, among others:

- Gayden made violent and inappropriate comments about females in Newman's presence, including, stating that he wanted to "shake the shit out of [his] wife" and that he wanted to "punch" a female employee in the face.

- Gayden repeatedly asked Newman to go to lunch with him and praised and complimented her when she was alone with him.

- Gayden made disparaging remarks about the other female employees, while making domineering and sexist comments to Newman such as, "Keep listening to me and doing what I tell you to do," "I'll protect you," "stay away from the troublemakers" and "I'm going to take care of you."

- Gayden regularly stood too close to Newman, hovered over her or over her shoulder, and crouched down low next to her while looking at Newman or her computer screen, and ignored her requests for "personal space."

- Gayden derogatorily referred to female employees as "heifer," "nagging," "Chihuahua" and "barking dog."

- Gayden left a disturbing message for Newman on her personal cell phone saying *"When you get this message, I need you to call me, this is Jimmy Walker, the late night stalker."*

- After Newman declined Gayden's lunch invitations, he became increasingly hostile and angry with her.

- In the presence of others, Gayden belittled Newman and falsely accused her of falsifying her timecard.

- Newman reported the hostile working conditions created by Gayden to Bennett in December 2015, but, Bennett failed to take any action, allowing the harassment to continue unfettered.

- Someone drew a picture of Newman's name and breasts on a whiteboard in the office.

- A poster was hung up in the office pointing directly at Newman which had a large, physically imposing male employee (the 6'4" Gordon) pointing a finger at Newman and stating "how much of a banged-up body do you want?" (One definition of "banged up" is "beaten up" or "injured;" "banging" also has sexual connotations.)

COMPLAINT                                                52

- After Newman expressed her concerns about an overnight TDY with a male employee, Gayden completely dismissed her concerns, saying that he did not care about what Newman or her husband thought.

- Gayden presented Newman with an unwarranted Performance Appraisal of a "3," which Gayden justified with "because I am the boss, and threatened to give Newman a low "1" rating on "teamwork," based on her refusal to go to lunch with him. Newman was the only member of the team that did not receive a monetary award or a "5" on the performance appraisal.

- After Newman reported Gayden's conduct to the Union, Gayden did not allow Newman to leave work on time to pick up her 1-year-old old baby from daycare, angrily instructing her "you can leave when I tell you you can" and instructing her to wait at work for a meeting with him.

- During the above-meeting, Gayden and another large, physically imposing (6'4") DCMA employee (Gordon) trapped Newman (4'10") in an office, and blocked the door.  In that meeting, Gayden angrily yelled at Newman and told her that he did not care about the JTR or the Union, and that he would not pay for her to take her own car to San Diego.  He kept her 1 ½ hours *past* her regular tour of duty, and thereafter, officially denied her request for $150 mileage reimbursement, denied her fitness time, and her request for overtime for attending the meeting he forced her to attend.

- Gayden rudely denied Newman entry to a scheduled meeting insisting that she first get her badge, and when she returned with the badge, callously told her that the meeting had been canceled.

- Gayden refused to acknowledge Newman's birthday, despite the fact that he celebrated all of the other team members' birthdays.

- Gayden yelled at Newman and other female employees, and often ordered her and the female employees around in a loud and intimidating voice, and stood or crouched inappropriately close to the female employees to intimidate them, but did not act this way towards the male employees.

- Gayden gave Newman false and unrealistic deadlines, but not the male employees.

- Gayden added job tasks to her workload outside the scope of her position, which he did not do to male employees.

- Gayden removed enjoyable job duties from Newman and gave them to male employee(s).

- Gayden required Newman to seek permission to take *pre-approved* maxi-flex time, but did not require the same of male employees.

- Gayden required Newman to seek permission to take her lunch break if she did not commence it at precisely 12:00 p.m.

- Gayden unreasonably denied Newman's requests to telework, but allowed the male employees to telework.

- Gayden told her during her quarterly performance, that she had the potential to be an "outstanding performer" if she could just "let things go," obviously referring to her Union complaints and the EEO case.

- Gayden falsely told Newman that he received a complaint from the Deputy Commander of the Tertiary, DCMA that she was rude and disrespectful.

- Gayden wrongfully blamed Newman for the alleged shortcomings of another female employee (Black) for which Newman had no responsibility, and did not do the same to Gordon, who actually accompanied the female employee on the mission to San Diego in question.

- Gayden humiliated and undeservedly punished Newman in team meetings.

- Gayden intimidated and tampered with the female witnesses in Newman's EEO case.

COMPLAINT                                    54

- Gayden instructed Gordon to track Newman's time and attendance (as well as another female employee) with surveillance cameras between July and November 2017, until Gayden was ordered to cease.

- Bennett took no actions against Gayden despite Newman's repeated pleas and complaints.

- After Newman, through her own efforts, became a full-time Union steward, Gayden pounded her office walls, stomped outside her office, slid his fingers along the base of her window, and peeked into her office, which he did not do to male employees.

- Gayden falsely accused Newman of disseminating private information about Gayden.

- Gayden and the DCMA falsely attributed statements made by others to Newman.

- Gayden and the DCMA wrongfully issued Newman a 3-day suspension, which was the first such mark on her 20-year stellar record.

- The DCMA falsely accusing her of lying on her security clearance paperwork, thereby jeopardizing her security clearance and consequently, her livelihood.

*See EEOC v. Nat'l Education Assoc.* (9th Cir. 2005) 422 F.3d.840.

111.   The conduct described herein was not wanted or welcomed by Newman.

112.   The alleged conduct was undertaken because of Newman's sex/gender, female.

113.   The conduct was so severe or pervasive that reasonable persons in Newman's position would find their work environment to be hostile or abusive.

COMPLAINT                         55

114.   Newman believed the work environment to be hostile and/or abusive as a result of the alleged conduct.

115.   Management level employees knew (or should have known) of the hostile and abusive conduct. Newman provided management level personnel, including Gayden, Bennet and others, with information sufficient to raise a probability of gender-based harassment in the mind of a reasonable employer. Moreover, the harassment was so pervasive and open that a reasonable employer would have had to have been aware of it. Indeed, management level employees were themselves actively participated in and/or were complicit in all, or the vast majority of, the abusive conduct.

116.   DCMA did not exercise reasonable care to prevent harassment in the workplace on the basis of sex/gender, and did not exercise reasonable care to promptly correct any harassing behavior that did occur.

117.   As a direct, legal and proximate result of the discrimination, Newman sustained, and will continue to sustain, compensatory damages to be proven at trial. As a result of DCMA's actions as alleged herein, Newman has suffered severe emotional distress and resulting medical issues and medical expenses as a result of the unlawful conduct described herein.  Newman's stress level was so high that it caused significant health issues and bodily injury.  Newman has suffered sleeplessness, anxiety, stress, depression, PTSD, marital strain, humiliation,

COMPLAINT                                      56

emotional distress, loss of self-esteem, excessive fatigue, ulcers/gastrointestinal issues, weight gain, elevated blood pressure, hair loss, nausea/vomiting and headaches, requiring numerous doctor visits, therapy sessions, prescription medications, use of sick leave and the costs associated therewith.  Additionally, Newman was wrongfully denied mileage reimbursement, monetary awards and bonuses, and preservation of her stellar 20-year professional reputation.  Newman is entitled to compensatory damages (pecuniary and non-pecuniary) in an amount to be proven at trial, but not less than $300,000.

118.   Additionally, Newman has employed and will continue to employ attorneys for the initiation and prosecution of her action. Newman has incurred and will continue to incur attorneys' fees and costs herein. Newman is entitled to an award of attorneys' fees and costs in an amount to be proven at the time of trial.

119.   Newman is also entitled to lost benefits, back pay, potential advancements and raises, including the QSI, to which she would have received had Defendant not acted illegally.  These damages are not subject to any cap.

120.   Newman is also entitled to loss of front pay, the compensation and benefits judged necessary to make up for the lost pay and benefits that the employee would have earned in the future absent the discrimination.  These damages are not subject to any cap.

121.    Newman is also entitled to injunctive relief, including but not limited to, the removal of negative performance reviews/appraisals, the unwarranted suspension, the proposed suspension, and other disciplinary actions from Newman's personnel file, and the halting of discriminatory practices against Newman and the other female employees at DCMA as described herein.

### THIRD CLAIM FOR RELIEF
### RETALIATION IN VIOLATION OF TITLE VII

122.    Plaintiff incorporates by reference and realleges each and every allegation contained in paragraphs 1 through 121 above as though fully set forth herein.

123.    Section 704(a) of Title VII of the Civil Rights Act of 1964, *as amended*, prohibits employers from discriminating against an employee "because [she] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a).

124.    Newman made informal and formal complaints about the harassment, discrimination and hostile working conditions countless times informally and informally to the Union, the EEO, the EEOC and numerous management personnel.  Each time she protested and reported the unlawful conduct, the retaliation was swift; the hostile working conditions escalated and the punishment more severe.

125.   As a result of Newman's complaints, DCMA took materially adverse actions against Newman, including, but not limited to, issuing proposed suspensions, suspensions, denial of high performance appraisals, denial of monetary awards and bonuses, and forcing Newman to work next to the Agency's legal representative who was representing the Agency in the EEOC proceedings.

126.   Gayden initially praised Newman, but after Newman rejected his advances and complained about the unfair treatment and hostile working conditions to which she was subjected, set on a path of retaliation.

127.   The adverse employment actions described herein constituted retaliatory workplace harassment.

128.   DCMA's retaliatory actions were sufficient to deter a reasonable person from engaging in protected activity under Title VII.

129.   As a direct, legal and proximate result of DCMA's retaliation, Newman has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.  As set forth above, Newman suffered severe emotional distress and resulting medical issues and medical expenses as a result of the unlawful conduct described herein. Newman's stress level was so high that it caused significant health issues and bodily injury.  Newman has suffered sleeplessness, anxiety, stress, depression, PTSD, marital strain, humiliation, emotional distress, loss of self-esteem, excessive

fatigue, ulcers/gastrointestinal issues, weight gain, elevated blood pressure, hair loss, nausea/vomiting and headaches, requiring numerous doctor visits, therapy sessions, prescription medications, use of sick leave and the costs associated therewith.  Additionally, Newman was wrongfully denied mileage reimbursement, monetary awards and bonuses, and preservation of her stellar 20-year professional reputation.

130.   Newman has employed and will continue to employ attorneys for the initiation and prosecution of her action. Newman has incurred and will continue to incur attorneys' fees and costs herein. Newman is entitled to an award of attorneys' fees and costs in an amount to be proven at the time of trial.

131.   Newman is also entitled to lost benefits, back pay, potential advancements and raises, including the QSI, to which she would have received had Defendant not acted illegally.  These damages are not subject to any cap.

132.   Newman is also entitled to loss of front pay, the compensation and benefits judged necessary to make up for the lost pay and benefits that the employee would have earned in the future absent the retaliation.  These damages are not subject to any cap.

133.   Newman also seeks injunctive relief to prevent further retaliatory acts and to stop Defendant from retaliating against Newman and others who complain about harassment, discrimination and other unlawful conduct in the workplace.

# PRAYER FOR RELIEF

Wherefore, Newman prays for a judgment awarding:

1.      Compensatory Damages, including pecuniary losses and emotional distress, in an amount not to exceed the legal cap;

2.      Back pay in an amount according to proof;

3.      Front pay in an amount according to proof;

4.      For reasonable attorneys' fees in an amount according to proof.

5.      Injunctive relief as permitted by law, including but not limited to, the removal of negative performance reviews/appraisals from Newman's file, the removal of the unwarranted suspension, proposed suspension, and other disciplinary actions from Newman's personnel file, an order directing the halting of discriminatory and retaliatory practices against Newman and all other female employees at DCMA as described herein, and such other injunctive relief as the Court may deem proper;

6.      For costs of suit incurred; and

7.      Such other and further relief as the Court may deem just and proper.

1

2

# JURY DEMAND

3

        Plaintiff demands a trial by jury on all issues so triable.

4

5

Respectfully submitted.

6

7

Date:  September 21, 2018              **WOOTTON LAW GROUP, LLP**

8

9

                                        /s/ *Amy T. Wootton*

10                                     _____

11                                      Chad B. Wootton

12                                      Amy T. Wootton
                                        *Attorneys for Plaintiff MEGAN*
13                                      *NEWMAN*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PROOF OF SERVICE